[Civ. No. 17460.   First Dist., Div. One.   Dec. 3, 1957.]

MARY ELIZABETH BLANKENSHIP, Appellant, v. ROBERT E. MICHALSKI, as City Attorney, etc., Respondent.

McDougall & Fairfax, Kenneth R. McDougall and William T. Joyce for Appellant.

Robert E. Michalski, City Attorney (Palo Alto), in pro. per., for Respondent.

PETERS, P. J.—Petitioner, as a resident and citizen of Palo Alto, brought this proceeding in mandamus to compel the

city attorney to commence an abatement proceeding against the claimed violators of the Palo Alto zoning ordinance. The trial court denied the application. Petitioner appeals.

It is the basic claim of petitioner that the Beck Prescription Pharmacy, operating in the Palo Alto Medical Clinic, is a drugstore functioning in a zone in which drugstores are prohibited, and, therefore, is violating the zoning ordinance.

The zoning ordinance in question divides the city into geographical areas and defines the uses permitted in each zone. The clinic is located in an R-4 zone. In such a zone there are permitted certain enumerated uses, and also all uses permitted in R-3-P, R-3, R-2, and R-1 zones. In R-1 zones various uses are permitted including "one-family dwellings, including private garages, accessory buildings and uses and home occupations." Medical and dental clinics are expressly allowed in R-3-P zones, and therefore, of course, are permitted in R-4 zones. Section 22.05 of the ordinance includes within the "accessory uses" permitted in R-4 zones, the "operation of necessary service facilities and equipment in connection with schools, colleges, hospitals, and other institutions when located on the site of the principal use." An accessory use is defined in section 4.03 as "a use or building incidental and subordinate to the principal use or building located upon the same lot." Drugstores are expressly allowed in C-1 and less restrictive zones, but are not allowed in more restrictive zones, and, in particular, are not allowed in R-4 zones.

In August of 1955 the clinic applied for a permit for the construction of a "professional pharmacy" in the clinic. Respondent, in his official capacity, advised the city manager that "the sale of drugs and pharmaceuticals and the filling of prescriptions in a clinic is an authorized accessory use in an R-3-P and R-4 district." In March of 1956 a building permit was issued to the clinic for the construction of the pharmacy. The pharmacy was constructed in the lobby of the clinic and then leased to Walter Beck, who operates it. It covers about 400 square feet of the lobby. No signs are used on the outside of the building, and the lease prohibits the use of such signs. The lease provides for rent based on a percentage of gross sales. Beck testified that he, three licensed pharmacists, and a clerk operate the pharmacy. A pharmacy license is displayed on the premises, and Beck has a permit to sell narcotics. The pharmacy is equipped with mortars, graduates, spatulas, labels, a typewriter, and the usual tools used in such a shop. It is stocked with a complete line of pharmaceuticals and prescrip-

tion items but does not carry "any of the so-called drugstore items such as toothpaste and kleenex," nor does it carry other nonpharmacy items usually sold in a drugstore. It does not operate a lunch counter. The lease provides that the leased premises "shall be actually used and occupied by the Lessee as a prescription pharmacy and for no other purpose . . . A prescription pharmacy is herein defined to [be] the following, and nothing else: (1) a place where drugs are dispensed and sold; (2) a place where prescriptions are compounded and dispensed." Admittedly, some drug items not requiring a prescription are sold, and some prescriptions are filled that are issued by nonclinic doctors. There was no evidence of what percentage of operations involved the filling of prescriptions issued by nonclinic doctors, or the percentage of sales of nonprescription items.

Under these facts petitioner claims that the pharmacy is operating in a zone prohibited by the ordinance, is a public nuisance, and should be abated. She demanded of respondent that he commence abatement proceedings. He refused, whereupon this proceeding in mandamus was instituted. The trial court found that it was not true that the use of the premises so described was a public nuisance, and that it was not true that the petitioner has no plain, speedy or adequate remedy at law. It concluded that the use involved was incidental and accessory to the use of the property as a clinic, and denied the petition for a writ of mandamus.

Respondent claims that mandamus will not lie because petitioner has a speedy and adequate remedy at law—an action for declaratory relief in which Beck and the clinic, who are not parties to the present proceeding, could also be made parties. This contention is without merit. ■ If the ordinance imposes a mandatory duty on respondent to commence a proceeding to enforce the ordinance, mandamus would lie even though another or other remedies may also exist. (*Board of Supervisors* v. *Simpson,* 36 Cal.2d 671 [227 P.2d 14] ; see also *Ross* v. *Board of Education,* 18 Cal.App. 222 [122 P. 967] ; *Saxton* v. *Board of Education,* 206 Cal. 758 [276 P. 998] ; *Raisch* v. *Board of Education,* 81 Cal. 542 [22 P. 890].)

A much more difficult question is whether the duty imposed on the respondent as city attorney by the ordinance is discretionary or mandatory. ■ Mandate, of course, cannot be employed to control the exercise of discretion by an administrative officer. (*Brock* v. *Superior Court,* 109 Cal.App.2d 594 [241 P.2d 283] ; *Drummey* v. *State Board of Funeral*

*Directors,* 13 Cal.2d 75 [87 P.2d 848]; *Bank of Italy* v. *Johnson,* 200 Cal. 1 [251 P. 784].) Section 28.02 of the ordinance provides: "Any building set up, erected, built, moved or maintained and/or any use of property contrary to the provisions of this Ordinance shall be and the same is hereby declared to be unlawful and a public nuisance, and the *City Attorney* shall immediately commence action or actions, proceeding or proceedings, for the abatement, removal, and enjoinment thereof in the manner provided by law and shall take such other steps and shall apply to such court or courts as may have jurisdiction to grant such relief as will abate and remove such building or use and restrain and enjoin any person, firm or corporation from setting up, erecting, building, moving or maintaining any such building or using any property contrary to the provisions of this ordinance."

██ In the present case the respondent, as city attorney, determined that no violation of the zoning ordinance would occur by the issuance of the permit, and so advised the city manager. Respondent contends that the ordinance necessarily confers upon him the power to determine, in the first instance, whether or not a violation has occurred. If he determines that a violation has occurred he must then proceed to try and abate it and can be compelled to do so by mandamus. (*Board of Supervisors* v. *Simpson,* 36 Cal.2d 671 [227 P.2d 14].) But, so he contends, if he in good faith determines that a violation has not occurred, then he is under no duty to start abatement proceedings and cannot be compelled to do so by mandamus. This contention appears to be sound (see *Boyne* v. *Ryan,* 100 Cal. 265 [34 P. 707]), at least where there are other more complete remedies available to a taxpayer who seeks to challenge the determination. Certainly, someone, in the first instance, must determine whether a proposed use will violate the ordinance. This requires an analysis of the facts and an interpretation of the ordinance. The responsibility of determining this question, in the first instance, is placed on the city attorney. He necessarily must have some discretion. Certainly, if he, in good faith, determines that no violation has occurred, he should not be compelled to institute abatement proceedings at the whim or caprice of every taxpayer who disagrees with him.

It may be that where the claimed violation is clear and obvious the determination by the city attorney that no violation had occurred, and his refusal to bring an abatement proceeding, would be such a clear abuse of discretion that

mandamus would issue. But that is not this case. Here, to say the least, it is reasonably debatable whether a violation has occurred. In such a situation the determination of the city attorney that no violation had occurred was well within his discretion, and should not be controlled by mandamus.

That the instant case involves a situation where the district attorney has, in good faith and within his discretion, determined that no violation of the zoning ordinance has occurred is demonstrated by the facts and by the terms of the ordinance. The trial court has determined that the use of part of the clinic's premises for a pharmacy does not violate the ordinance. It not only determined that the question was reasonably debatable, but found, as a fact, that such use was not a public nuisance, as it would be were it in violation of the ordinance. The court concluded that the pharmacy use "is incidental and accessory to the use of said property as a clinic and as such is a permitted use and is not a public nuisance." There is much to be said in support of this conclusion.

Section 22.05 of the ordinance defines accessory uses permitted in R-4 zones as the "operation of necessary service facilities and equipment in connection with schools, colleges, hospitals, and other institutions when located on the site of the principal use." Appellant argues that "necessary" means "indispensable," and contends that the operation of the pharmacy is not "indispensable" to the operation of the clinic. She also contends that the clinic is not one of the "other institutions" mentioned in the section.

It will also be remembered that article 6 of the ordinance permits "accessory buildings and uses" in R-1 zones, and that in R-4 zones, in one of which the clinic is located, certain enumerated uses are permitted and also all uses permitted in other zones, including R-1 zones. Thus, it follows, inevitably, that "accessory" uses are permitted in R-4 zones. Appellant argues that a "drug store" cannot be an accessory use for the clinic because "drug stores" by necessary implication, are prohibited from being in R-4 zones. She also urges that a "drug store" is not incidental to a clinic because a "drug store" is not dependent on a clinic for its existence, and that it is not a normal activity of a doctor or group of doctors to operate a "drug store." It is claimed that the doctors are not using the "drug store" as an incident to the operation of the clinic, but as a commercial enterprise, and

are leasing it to a third person who is engaged in a commercial project.

Several of these arguments demonstrate how difficult and impractical it is to determine these matters in this type of proceeding in which the evidence as to actual operations is very limited, and in which Beck and the clinic are not parties. We have no doubt that, if the doctors simply leased a portion of their premises for the operation of a commercial drugstore, such use would violate the ordinance. The fact that the prescriptions of clinic doctors are filled at such a drugstore would not necessarily make it a proper incidental or accessory use. But here, all we know from the record is that the pharmacy fills the prescriptions of the clinic doctors for clinic patients and also fills prescriptions prescribed by other than clinic doctors. What the proportion of inside to outside sales may be, we do not know. This might be of decisive importance.

Certainly, the fact that the 85 doctors involved who own and operate the clinic decided to lease the operation to an independent contractor is not decisive. No one could reasonably contend that the doctors could not have hired a licensed pharmacist to fill their prescriptions and could not have assigned him space in the building to perform his duties. Such use would clearly be incidental and accessory to the operation of the clinic. If they could have done this by the hiring of a pharmacist, the fact they decided to do it through a lease and contract with an independent contractor, is not decisive. The question is as to the nature of the use, not the mechanics of how such use is secured.

We do know that Beck did not operate the pharmacy like an ordinary drugstore. He only filled prescriptions and sold only drugs.

In support of her contention that the use here involved violated the terms of the ordinance appellant heavily relies on the case of *Medico-Dental etc. Co.* v. *Horton & Converse,* 21 Cal.2d 411 [132 P.2d 457]. In that case a lessor leased a ground floor store of his building for the operation of a drugstore. The lease provided that the ''Lessor agrees not to lease or sublease any part or portion of the Medico-Dental building to any other person . . . for the purpose of maintaining a drug store or selling drugs or ampoules, . . . during the term of this lease.'' (P. 415.) The lessor then leased a floor of the building to a group of doctors. They maintained a drug room where drugs were sold and prescriptions filled upon

request of the doctors. The drugstore downstairs refused to pay rent. The lessor sued the drugstore for rent. The court held that the doctor's drugstore was in competition with the downstairs store, and the landlord should have tried to abate this unlawful competition. By not doing so, the landlord breached the lease and so could not collect the rent.

The basis of the court's ruling was that the provision of defendant's lease above-quoted was to protect him from the competition of the sale of drugs. Obviously, the defendant drugstore expected a large part of its business to be from doctors in the building. When the doctors went into the business of selling drugs, they were in a business in direct competition with the defendant. This case involves the interpretation of a covenant against competition in a lease—not the interpretation of a zoning ordinance. Not only is the language of the lease far different from the language of the zoning ordinance here involved, but, obviously, the intent and purpose of such a covenant is entirely different from the intent and purpose of a zoning ordinance.

For these reasons we hold that the trial court properly denied the petition for a writ of mandate. The judgment so holding is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 2, 1958, and appellant's petition for a hearing by the Supreme Court was denied January 28, 1958.